# United States Court of Appeals
## For the First Circuit

No. 11-2106

AUTOMOTIVE INDUSTRIES PENSION TRUST FUND,

Plaintiff, Appellant.

CITY OF ROSEVILLE EMPLOYEES' RETIREMENT SYSTEM,

Plaintiff,

v.

TEXTRON INC.; LEWIS B. CAMPBELL; TED R. FRENCH,

Defendants, Appellees.

ANGELO BUTERA; THOMAS F. CULLEN; BUELL J. CARTER, JR.;
DOUGLAS WILBURNE; TEXTRON FINANCIAL CORP.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Paul J. Barbadoro, U.S. District Judge]

Before

Boudin, Circuit Judge,
Souter,[*] Associate Justice,
and Thompson, Circuit Judge.

Douglas Wilens with whom David J. George, Robert J. Robbins,
Samuel H. Rudman and Robbins Geller Rudman & Dowd LLP were on brief
for appellant.

---

[*]The Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

Mitchell A. Karlan with whom Brian M. Lutz, Gibson, Dunn & Crutcher LLP, John A. Tarantino, Patricia K. Rocha, Nicole J. Benjamin and Adler Pollock & Sheehan P.C. were on brief for appellees.

———————————————

June 7, 2012

———————————————

**BOUDIN, Circuit Judge.** This appeal arises from a securities fraud class action against Textron, Inc. ("Textron") and several of its senior officers. The relevant Textron businesses are Cessna Aircraft Company ("Cessna"), a wholly owned subsidiary accounting for approximately 40 percent of Textron's 2008 revenues, Textron Financial Corporation ("TFC"), which finances Textron's various ventures, and TFC's dedicated Cessna Finance arm. Lewis B. Campbell was President and CEO of Textron, and chaired its board; Ted R. French and Buell J. Carter were senior executives and Douglas Wilburne headed investor relations.[1]

Over the course of 2007 and 2008, on the edge and outset of the recession, Textron made public statements assuring its investors of the strength and depth of the backlog of orders at Cessna, which Textron represented would help carry it through difficult economic times. In July and October 2007, and January, July and November 2008, Textron reported record levels of "aircraft and defense" backlog. Campbell and Wilburne also assured investors that Cessna did not permit customers to sell delivery positions, that is, the customer's priority in receiving ordered aircraft.

---

[1]The defendants in the district court, in addition to Campbell, were French, Executive VP and CFO of Textron and President and CFO of TFC; Carter, President and COO of TFC; Thomas Cullen, Executive VP and CFO of TFC; Wilburne, VP of Investor Relations at Textron; and Angelo Butera, Chief Credit Officer at TFC.

Attesting to the backlog's strength, Campbell said in January 2008 that Cessna was seeing "unusually low cancellations." In a July 17, 2008, conference call with investors, Campbell and Wilburne said Cessna had only seen two cancellations in the first two quarters of 2008. Again in October 2008, Campbell said that "[c]ancellations are not even noteworthy." As late as November 2008, Campbell said "on the cancellations front, which is encouraging and interesting, we aren't seeing any more cancellations than we did last year or the year before at this time. So we don't have a huge buildup of cancellations."

In December 2007, Reuters quoted Campbell as saying "[i]f we were running on a very low backlog, I'd be nervous, but the converse is true." In a conference call on April 17, 2008, French told investors "[o]rders is not really going to be the driver. It is backlog." The backlog--whose "size and resiliency" Campbell emphasized in the July 2008 call--was also invoked as compensating for a fall-off in Textron's financial services business. And when Textron revised downward Cessna's jet aircraft production schedule on November 4, 2008, Campbell said:

> [W]e believe our record aerospace and defense backlog and pending customer orders of nearly $30 billion will provide a cushion and ballast to weather the uncertainties we face as we go forward.

Nevertheless, three months later, on January 29, 2009, Textron reported substantial cuts to Cessna's production levels due

to a disappointing fourth quarter 2008: few orders, 23 cancellations, and "an unprecedented number of deferrals" of delivery dates by customers. Textron stock closed at $9.09 that day, down 31 percent from the previous day, and 87 percent from the class period high. Shortly thereafter, Campbell stepped down as President (remaining as CEO and Chairman), and French and Carter departed.

In a February 2009 analyst report, J.P. Morgan wondered "how we go from 3.5 years of backlog six months ago to a 20% y/y production decline for 2009 that is only 80% sold out." Automotive Industries Pension Trust Fund ("the Fund") answers that for over 18 months, Textron had misstated the strength of Cessna's backlog. After another investor initiated the lawsuit now before us, the Fund served as lead plaintiff for a class of all purchasers of Textron securities between July 19, 2007, and January 29, 2009, who charge Textron under the securities laws with intentionally false or misleading statements.[2]

The complaint does not challenge the technical accuracy of most of Textron's statements, for example, the precise dollar

---

[2]Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-1, and (as to the individual defendants) Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a). The claim under section 20(a) is derivative, ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 67-68 (1st Cir. 2008), and needs no separate discussion. Additional counts alleging violations of sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k(a), 77o, were dismissed by agreement and are not at issue here.

figures of backlog.  Rather, plaintiffs charged--so far as is pertinent to this appeal--that the Cessna backlog was artificially inflated, that Textron deliberately omitted material information revealing this fact, and that Textron's officers could not have believed in the truth of their unrelentingly positive avowals of the backlog's strength.  Plaintiffs relied on 23 confidential witnesses to show the following weaknesses in the backlog:

> -Cessna implemented lowered underwriting standards sometime before June 2007, thus providing loans to highly risky customers.  A former Credit Manager at Cessna Finance said his number of declined loans dropped by 90%, and that the new credit standards were "absurd" because Cessna Finance was approving loans for customers who were "barely cash-flowing."
>
> -In April 2007, Cessna began financing 100% of customer deposits.  A former Cessna Customer Solutions Manager said deposit financing was a sure sign the customer could not actually afford the aircraft.
>
> -Around the same time, Cessna began providing generous loan repayment terms and extended the standard amortization schedule from 12 to 20 years.
>
> -Over 2007 and 2008, Cessna accepted more orders from international Authorized Sales Representatives (ASRs), which were merely contingent because they involved no end-buyers at time of order.  A former Business Finance Partner at Cessna said it was well-known that many orders were contingent and that customers were essentially buying "delivery positions."
>
> -Cessna placed increasing pressure on buyers to delay rather than cancel orders altogether.

The Fund also says that certain of Textron's factual statements about cancellation figures were false when made--for example, that Cessna had only two cancellations as of July 2008, or that as of November 2008 cancellations did not exceed the prior year's figures. However, the main thrust of plaintiffs' complaint and the evidence recounted in it concerned the failure to disclose information about the weakness of the backlog due to relaxed financing arrangements and other practices.

On Textron's motion to dismiss, Fed. R. Civ. P. 12(b)(6), the district court found the allegations insufficient to show that material information was omitted. The court ruled that the allegations of relaxed underwriting standards were too vague; that plaintiffs failed to explain clearly how the standards changed, how many loans were affected, or whether the allegedly risky loans translated into cancellations or losses; and that generous financing did not show that a customer could not afford an aircraft. City of Roseville Emps.' Ret. Sys. v. Textron, Inc., 810 F. Supp. 2d 434 (D.R.I. 2011).

As for the plaintiffs' claims that a few statements were literally false, the court said that nothing indicated that reports of only two year-to-date cancellations as of July 17, 2008, were false, even though there was evidence of a sudden increase in cancellations in "late summer 2008." According to the court, the complaint also failed to include cancellation figures from prior

years that could contradict the November 2008 statement about year-to-date cancellations.  Textron, 810 F. Supp. 2d at 445.

The Fund now appeals, saying that the complaint was sufficient to withstand a motion to dismiss.  Our review is de novo.  Miss. Pub. Emps.' Ret. Sys. v. Boston Scientific Corp., 523 F.3d 75, 85 (1st Cir. 2008).  We conclude that the complaint was deficient but regard the materiality issue as a close call and rest instead on the failure of the complaint to plead facts justifying a reasonable inference of scienter.  The scienter issue was briefly mentioned by the district court, which did not have to reach it, but it was argued below and fully briefed on appeal.

Section 10(b) requires plaintiffs to plead (1) material misrepresentation or omission; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation.  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).  The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b)(1), (2), requires plaintiffs to specify each allegedly misleading statement and why it is misleading--along with special requirements as to scienter that are described hereafter.  The PSLRA was deliberately intended to stiffen the requirements for securities lawsuits. Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 81-82 (2006).

Under section 10(b), when a company makes affirmative statements, it must include whatever disclosures and qualifications are needed to avoid misleading a reasonable investor. <u>Backman</u> v. <u>Polaroid Corp.</u>, 910 F.2d 10, 16 (1st Cir. 1990) (en banc). A substantial weakening of a company's traditional requirements for listing orders as backlogged, if slackened standards were not disclosed, could make such backlog figures materially misleading. <u>Cf.</u> <u>Aldridge</u> v. <u>A.T. Cross Corp.</u>, 284 F.3d 72, 79-82 (1st Cir. 2002).

If this occurred here, Textron's general warnings about the possibility of cancelled orders--of which there were a number[3]--would not rescue it from liability. Such warnings might insulate Textron from liability for "forward-looking statements" like revenue projections, 15 U.S.C. § 78u-5, but not for intentionally misleading characterizations of the present or historical state of the backlog. <u>Cf.</u> <u>In re Smith & Wesson Holding Corp. Sec. Litig.</u>, 604 F. Supp. 2d 332, 341, 344-45 (D. Mass. 2009).

Based on the complaint, it is hard to assess whether disclosures would have altered the total mix of available

---

[3]In the July 2008 call, Campbell disclosed that "[p]ortions of our backlog are susceptible to normal cancellations or deferrals. And we'll likely see cancellations." Textron also repeatedly warned in SEC filings and press releases of the risk of "changes in aircraft delivery schedules or cancellation of orders," and that "[a]ircraft customers . . . may respond to weak economic conditions by delaying delivery of orders or canceling orders."

information for a reasonable investor.  Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988).  For example, the district court pointed to the lack of detail surrounding the allegedly relaxed underwriting standards and the effect on the backlog.  But the line between pleading enough facts and proving one's case in the complaint is a hard one to draw .  Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp., 632 F.3d 762, 773 (1st Cir. 2011).

The district court viewed the allegations against Textron as less compelling than those in Hill v. Gozani, 638 F.3d 40 (1st Cir. 2011), where this court upheld the dismissal of section 10(b) claims against the manufacturer of a new medical device. The company there had not disclosed internal disagreement about whether procedures using the device could be billed to insurers under previously-accepted codes--a practice critical to the device's financial success.  Indeed, the manufacturer expressed optimism about a favorable outcome.

But the manufacturer in Hill expressly warned that it did not know how third-party payers--the crucial actors--would ultimately decide the level of reimbursement.  A reasonable investor could read such warnings, consult other sources about how the payers might view the matter and gauge likelihoods for himself. In our case, the only information available to investors about the Cessna backlog was what Textron told them.  Cf. N.J. Carpenters

<u>Pension & Annuity Funds</u> v. <u>Biogen IDEC Inc.</u>, 537 F.3d 35, 47 (1st Cir. 2008).

The confidential witnesses also provide at least some indication that underwriting standards were loosened, while Textron comforted investors with assurances of its "traditional strong conservative underwriting process."  And discovery might have clarified issues such as the exact changes and terms of the underwriting process, whether international ASR orders were unusual or especially problematic, the extent and success of any campaign to encourage deferral over cancellation, raw numbers about cancellations, and--as to each of these phenomena--how much of the backlog was affected.

So as to materiality, this complaint may not be "the kind of vague prelude to a fishing expedition that Congress sought to bar by imposing the clarity-and-basis requirement of the PSLRA." <u>In re Stone & Webster, Inc., Sec. Litig.</u>, 414 F.3d 187, 198 (1st Cir. 2005).  Summary judgment is usually a more appropriate occasion to decide whether such details are of marginal interest or so important that Textron's statements were misleading without them.  <u>E.g.</u>, <u>In re Smith & Wesson Holding Corp. Sec. Litig.</u>, 669 F.3d 68 (1st Cir. 2012).

We need not decide the materiality issue because the complaint fails adequately to allege scienter.  Unlike some securities statutes, section 10(b)'s anti-fraud language, together

with the PSLRA, requires that for each misstatement or omission the complaint state with particularity facts creating a strong inference that defendant acted with scienter--an intent to deceive, manipulate, or defraud, <u>Tellabs, Inc.</u> v. <u>Makor Issues & Rights, Ltd.</u>, 551 U.S. 308, 318-22 (2007), or a high degree of recklessness suggesting an indifference to deceit, <u>Aldridge</u>, 284 F.3d at 82.

Nothing in the complaint suggests that any of the named officers believed, or was recklessly unaware, that the backlog's significance had been undermined by weakened underwriting standards, sales to intermediates, or any of the other flaws on which the plaintiffs rely. And the questionable materiality of the practices, depending importantly on matters of degree and detail, deprives any inference of scienter of forward momentum that would be helpful to plaintiffs. <u>City of Dearborn Heights Act 345 Police & Fire Ret. Sys.</u> v. <u>Waters Corp.</u>, 632 F.3d 751, 757 (1st Cir. 2011).

Textron's top managers may have been negligent if they were not aware; surely French was extravagant in saying of the backlog that Textron had "torn it apart." But negligence or puffing are not enough for scienter, <u>Greebel</u> v. <u>FTP Software, Inc.</u>, 194 F.3d 185, 198-99, 207 (1st Cir. 1999); and warnings by subordinates or expressions of concern by executives are notably absent, as is an unusually compelling case on materiality. <u>Compare</u> <u>Berson</u> v. <u>Applied Signal Tech.</u>, 527 F.3d 982 (9th Cir. 2008)

(failure to disclose that reported backlog included tens of millions of dollars in stop-work orders).

The few counters offered by the Fund underscore the absence of such evidence. For example, the Fund says Cessna violated its non-refundable deposit policy and policy against selling delivery slots, and alleges that sales to ASRs were an example of effectively inflating backlog. A concealed change in company policy might, depending on the circumstances, assist an inference of scienter. Cf. Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226, 235 (D. Mass. 1999).

But Textron says financing deposits did not mean they were refundable, and nothing shows that ASR sales were unusual. Textron regularly made investors aware of international orders, while plaintiffs provide no detail as to what proportion of international orders were placed by ASRs, or whether that ratio increased during the class period.

And Textron flatly denied agreeing that customers could sell slots, admitting only that "[o]ccasionally one will sneak through on us." Read closely, the complaint's more specific allegations amounted to saying that customers wanted to sell slots or hoped they would be allowed to do so. So, while the relatively detailed factual proffers in the complaint go some distance toward making a case for materiality, they are considerably weaker in

offering any direct evidence of guilty knowledge or fraudulent intent.

The Fund does note some stock sales by Campbell and French during the class period, but this cannot add much to the inference of scienter without something (e.g., points of comparison from outside the class period) to show that these sales were unusual. Greebel, 194 F.3d at 207. The Fund also observes that the officers' careers and the survival of the company were on the line, cf. In re Cabletron Sys., Inc., 311 F.3d 11, 39 (1st Cir. 2002), but this is hardly the particularized showing required by the PSLRA.

If Campbell knowingly understated the number of cancellations in July 2008, this would be would be "classic evidence of scienter." ACA Fin., 512 F.3d at 65 (internal quotations and citations omitted). But, as the district court observed, on the crucial question of when cancellations began piling up, cf. N.J. Carpenters, 537 F.3d at 47-48, Campbell's statement and the confidential witness' description of cancellations increasing "suddenly" in "late summer" are not in conflict.

As in all dispositions under Rule 12(b)(6), the Fund had no access to compulsory discovery and could not search company files or depose the individual defendants. But while a trawl through archives may sometimes catch a few fish,

Congress--concerned about the cost and disruption--deliberately raised the entry bar to discovery both through the PSLRA's heightened pleading standards and by other measures.  See <u>Merrill Lynch</u>, 547 U.S. at 81; <u>Hill</u>, 638 F.3d at 54.  Such trade offs based on real-world experience are what legislative judgment is all about.

This leaves a plaintiff's counsel with a greater than usual burden of investigation before filing a securities fraud complaint.  Yet where district judges face promising complaints that fall into an intermediate gray area, they have in practice some latitude to refuse to dismiss some or all counts and allow discovery, whether narrowly focused or in full.  <u>Nomura Asset</u>, 632 F.3d at 774.  This complaint's scienter allegations were weaker than its materiality allegations and did not even arguably fall into a gray area encouraging further proceedings.

<u>Affirmed</u>.